# United States Court of Appeals
### For the Eighth Circuit

_____

No. 16-4006

_____

United States of America

*Plaintiff - Appellee*

v.

Randy Joe Metcalf, also known as Randy Joe Weyker

*Defendant - Appellant*

------------------------------

Cato Institute; Reason Foundation; Individual Rights Foundation; Gail Louise
Heriot; Peter N. Kirsanow; Center for Equal Opportunity

*Amici on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the Northern District of Iowa - Dubuque

_____

Submitted: September 21, 2017
Filed: February 2, 2018

_____

Before SMITH, Chief Judge, WOLLMAN and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge

A jury convicted Randy Joe Metcalf of committing a hate crime in violation of the Matthew Shepard and James Byrd, Jr., Hate Crimes Prevention Act of 2009, 18 U.S.C. § 249(a)(1) (the Act).[1] The district court[2] sentenced Metcalf to the statutory maximum sentence of 120 months' imprisonment. Metcalf appeals, arguing that the Act is unconstitutional because Congress lacked the authority to enact it under the Thirteenth Amendment. Metcalf also argues that the district court erred in denying his request for a proposed jury instruction on character evidence and that the evidence was insufficient to support his conviction. We affirm.

## I. Background

On January 11, 2015, Metcalf and his fiancee Noelle Weyker went to a bar in Dubuque, Iowa, where Metcalf met a friend, Jeremy Sanders (Jeremy) and Jeremy's son, Joseph Sanders (Joseph). As the evening progressed, Metcalf, Weyker, Jeremy, and Joseph drank alcohol and played pool. As recorded by the bar's surveillance cameras, at around 11:00 p.m. Metcalf became involved in an argument with Katie Flores, Sarah Kiene, and Lamarr Sandridge, an African American man. Although the confrontation was mostly verbal, Metcalf pushed Sandridge before Becky Burks, the bartender, and Ted Stackis, the bar's owner, intervened.

Following the confrontation, Metcalf spoke with Stackis, bragging about how he had burned crosses at an African American family's home in Dubuque. Metcalf told Stackis, "I hate f---ing n----rs," and asked if Stackis wanted anyone taken care of. Metcalf and Stackis then went outside, where Metcalf showed Stackis his swastika tattoo and repeated how he "hate[d] them f---ers."

---

[1] After trial and before sentencing, Metcalf married his fiancee and legally changed his surname to "Weyker." Because the name "Metcalf" was used during trial and at sentencing, we will refer to the defendant as "Metcalf."

[2] The Honorable Linda R. Reade, then Chief Judge, United States District Court for the Northern District of Iowa.

As the night continued, Metcalf, Flores, and Kiene continued to harass each other, with Metcalf referring to Flores and Kiene as "n----r loving c--ts" and "n----r lovers." Metcalf also continued to use the word "n----r." The women responded by calling Metcalf a "stupid f---er." While visiting with Jeremy, Metcalf displayed his swastika tattoo and said, "That's what I'm about."

Tensions in the bar peaked around 1:20 a.m., when Kiene confronted Metcalf. Weyker started recording the confrontation on her cell phone and a fight ensued when Flores slapped Weyker's phone out of her hands. During the melee, Metcalf charged at Flores, hit her in the head, slammed her into the bar, and pulled her to the ground by her hair. Other individuals then piled on top of each other. Trying to stop the attack, Sandridge struck Metcalf a few times. Jeremy then grabbed Sandridge and held him in a headlock, while son Joseph punched Sandridge in the face ten to fifteen times. As people got up from the floor, Metcalf pushed past Jeremy and Flores to get to Sandridge, who was lying disoriented on the floor. Metcalf then repeatedly kicked and stomped on Sandridge's head, saying, "f---ing n----r" and "die n----r" until Burks pushed him away.

Metcalf left the bar momentarily, but he soon returned and maneuvered around the people standing near Sandridge. As Sandridge lay on the ground, dazed from the initial attacks, Metcalf kicked and stomped on Sandridge's head a second time, continuing in his attack until Flores pushed him away. Metcalf responded by slapping Flores to the ground and walking away. The day following the attack, Metcalf told Jeremy that "the n----r got what he had coming to him."

Metcalf was indicted on one count of violating Section 249(a)(1) of the Act. The indictment alleged that Metcalf had "willfully caused bodily injury to [Sandridge], who is African American, because of [Sandridge's] actual or perceived race, color, and national origin." Metcalf challenged the indictment on constitutional grounds and filed a motion to dismiss, which the district court denied.

The parties agreed during trial that Metcalf had attacked Sandridge, leaving for the jury the question whether Sandridge's race was the reason for the attack. Witnesses for the government, including Stackis, Flores, Kiene, Burks, and Jeremy, testified about Sandridge's use of the word "n----r," his swastika tattoo, and his statements made throughout the night of the attack and the next day. In response, Metcalf called seven witnesses who had seen him interact with African American people, all of whom testified that they believed Metcalf was not racist. Based on this testimony, Metcalf requested the following jury instruction:

> You have heard the testimony of {Witness}, who said that the defendant has a reputation and character for a lack of racism. Along with all the other evidence you have heard, you may take into consideration what you believe about the defendant's lack of racism when you decide whether the government has proved, beyond a reasonable doubt, that the defendant committed the crime. Evidence of the defendant's lack of racism alone may create a reasonable doubt whether the government proved that the defendant committed the crime.

The court denied the request and instead gave a general instruction, which stated that "[t]he jurors [were] the sole judges of the weight and credibility of the testimony and the value to be given to the testimony of each witness who ha[d] testified in this case." Metcalf's attorney argued to the jury that because Metcalf is not a racist, he could not have committed a hate crime.

## II. Discussion

Metcalf argues that the district court erred in denying his motion to dismiss the indictment, claiming that the Act is unconstitutional because Congress lacked the authority to enact it under the Thirteenth Amendment. We review *de novo* the denial of Metcalf's motion to dismiss. United States v. Coppock, 765 F.3d 921, 922 (8th Cir. 2014).

-4-

The Act provides that "[w]hoever . . . willfully causes bodily injury to any person . . . because of the actual or perceived race, color, religion, or national origin of any person . . . shall be imprisoned not more than 10 years, fined in accordance with this title, or both[.]" 18 U.S.C. § 249(a)(1). Congress enacted Section 249(a)(1) through the power conferred upon it by the Thirteenth Amendment, which states:

> Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

> Section 2. Congress shall have power to enforce this article by appropriate legislation.

In Jones v. Alfred H. Mayer Co., 392 U.S. 409 (1968), the Supreme Court held that the Thirteenth Amendment empowered Congress to prohibit racial discrimination in the public or private sale or rental of real estate. Id. at 437-39. The Court explained that Section 2 of the Amendment gave Congress not only the authority to abolish slavery, but also the "power to pass *all laws necessary and proper for abolishing all badges and incidents of slavery in the United States*." Id. at 439 (citing Civil Rights Cases, 109 U.S. 3, 20 (1883)). Rather than itself defining the "badges and incidents of slavery," the Court wrote, "Surely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." Id. at 440. Adopting the Supreme Court's analysis in Jones, we upheld the constitutionality of Section 249(a)(1) in United States v. Maybee, 687 F.3d 1026, 1031 (8th Cir. 2012). Although Metcalf raises a constitutional challenge different from that raised in Maybee, the fundamental premise of Maybee still applies: Section 2 of the Thirteenth Amendment confers upon Congress the authority to "rationally [] determine what are the badges and incidents of slavery." Id. at 1030 (quoting Jones, 392 U.S. at 439-400); see also United States v. Bledsoe, 728 F.2d 1094 (8th Cir. 1984) (discussing 18 U.S.C. § 245(b)).

Metcalf argues, however, that the Supreme Court's decisions in Shelby County v. Holder, 133 S. Ct. 2612 (2013), and City of Boerne v. Flores, 521 U.S. 507 (1997), undermine the legal underpinnings of Jones and Maybee, because in both Shelby County and Flores the Court ruled that Congress had exceeded its lawmaking authority under the Reconstruction Amendments. In Shelby County, the Court held that the coverage formula under Section 5 of the Voting Rights Act of 1965 exceeded Congress's authority under the Fifteenth Amendment because the legislation was not supported by current evidence of racial discrimination in voting. 133 S. Ct. at 2619, 2631. In Flores, the Court held that the Religious Freedom and Restoration Act of 1993 exceeded Congress's authority under the Fourteenth Amendment because it lacked a congruence and proportionality with the injury to be prevented. 521 U.S. at 511, 516, 520. Metcalf asks that we apply to Section 249(a)(1) the same limiting principles outlined in those two cases.

Whatever force Metcalf's arguments might have in other contexts, neither Shelby County nor Flores addressed Congress's power to legislate under the Thirteenth Amendment. For the reasons set forth by the Fifth and Tenth Circuit Courts of Appeals in their discussions of Section 249(a)(1), we conclude that Jones constitutes binding precedent that we must follow. See United States v. Cannon, 750 F.3d 492, 505 (5th Cir. 2014); United States v. Hatch, 722 F.3d 1193, 1201 (10th Cir. 2013). As did the Tenth Circuit in its most thorough discussion of the history of the Reconstruction Amendments and its specific analysis of Section 249(a)(1), we too conclude that Congress rationally determined that racially motivated violence constitutes a badge and incident of slavery. Id. at 1201, 1206. The district court thus did not err in denying Metcalf's motion to dismiss the indictment on constitutional grounds.

With respect to the district court's refusal to give the proposed jury instruction on character evidence, Metcalf argued at trial that he should be allowed to present character evidence of specific instances of conduct under Federal Rule of Evidence

405 because his character for a lack of racism was an essential element of the charge and his defense. The district court, "out of an abundance of caution," admitted the evidence. Assuming that Metcalf's character for a lack of racism was an element of the charge and his defense, we conclude that the district court did not abuse its discretion in refusing to give the requested instruction. See United States v. Gianakos, 415 F.3d 912, 920 (8th Cir. 2005) (standard of review).

In United States v. Krapp, 815 F.2d 1183 (8th Cir. 1987), we ruled that a district court was not required to give a character evidence instruction even though the defendant's character evidence went directly to an element of the offense. Id. at 1187. Additionally, we ruled that "[a] district court has wide discretion in formulating jury instructions, and a defendant is not entitled to a particularly worded instruction if the instructions as a whole adequately cover the substance of the requested instruction." Id. at 1187-88. Here, the district court's instruction that the jurors were "the sole judges of . . . the value to be given to the testimony of each witness" would of necessity have included testimony regarding Metcalf's character and thus accurately and sufficiently set forth the law. Metcalf's reliance on Salinger v. United States, 23 F.2d 48 (8th Cir. 1927), for the proposition that a defendant is entitled to a jury instruction on character evidence whenever character evidence is introduced at trial, is misplaced. Salinger addressed evidence of good character in general—the defendant's reputation for honesty and integrity—not character evidence that was an essential element of the charge or a defense.

Metcalf argues in the alternative that the district court should have given his proposed instruction because it explained his legal theory. Again, however, we conclude that the district court did not abuse its discretion in denying Metcalf's request, because "the instructions as a whole, by adequately setting forth the law, afford[ed] counsel an opportunity to argue the defense theory and reasonably ensure[d] that the jury appropriately consider[ed] it." United States v. Christy, 647 F.3d 768, 770 (8th Cir. 2011).

-7-

Finally, Metcalf argues that insufficient evidence exists to sustain his conviction. We review this claim *de novo*, viewing the evidence in the light most favorable to the verdict. United States v. Wiest, 596 F.3d 906, 910 (8th Cir. 2010). In light of Metcalf's repeated racially based comments, coupled with the surveillance cameras' depiction of the viciousness of his racially based initial attack upon the defenseless Sandridge, followed by his return to the bar to administer an equally vicious renewed attack, we need say no more than that the evidence was clearly sufficient to support the conviction.

The judgment is affirmed.

_____