JAMES C. HO, Circuit Judge, concurring:
*337 Delta Charter School first opened its doors to K-12 students in Louisiana in 2013. The parties agree that Delta has never been found guilty of racial discrimination. A consent decree nevertheless requires Delta to adopt various racial balancing policies as a condition of operating the school.
Among other things, the consent decree requires that "Delta Charter Group's student enrollment will reflect the racial demographics of the Concordia Parish School District." For example, the "Kindergarten class for the 2017-2018 school year ... shall at all times be comprised of equal number of minority (African-American) and non-minority (Caucasian and other) students (i.e., a 1:1 ratio)." Delta must also "amend its ... lotteries to incorporate a preference for a student who seeks to enroll at Delta Charter School from a Concordia Parish school where his/her race is overrepresented compared to the overall racial demographics of the District."
The district court required these racial balancing requirements pursuant to a desegregation order entered against the Concordia Parish School Board in 1970-nearly half a century before the opening of Delta Charter School.
Delta opposes these racial balancing requirements as unconstitutional. In so doing, Delta raises an important question: If a charter school wishes to open and operate in geographic proximity to a public school district that is still subject to a decades-old desegregation order-and the charter school has itself never been found guilty of segregation-can a federal court nevertheless impose racial balancing requirements on the charter school?
The parties agree that this weighty constitutional question is an issue of first impression. But I agree with the majority that we are not in a position to answer that question today, because Delta has not adequately presented it at this time. Accordingly, I join the majority opinion and agree that Delta must present these issues in a future proceeding before the district court.
I.
During oral argument, Delta made clear that it questions the constitutionality of the racial balancing policies it is currently required to administer. And in the district court, Delta did file a motion asking the district court to modify the consent order by removing the racial balancing provisions.
But as the majority opinion correctly points out, Delta did so in untimely fashion, on the eve of a district court hearing on the Concordia Parish School Board's motion for further relief under the consent order. What's more, Delta's notice of appeal states that it is appealing from the grant of further relief to the School Board under the consent order-not the denial of its own motion to modify the consent order. Indeed, Delta's reply brief states that the district court "has yet to rule" on its motion. So even assuming the issue was squarely presented below, it is not properly before us on appeal.
II.
On remand, Delta is entitled to a fair hearing on its constitutional challenge to the racial balancing requirements. The claim is an important one, because there are serious questions here that should be litigated fully. Indeed, the Supreme Court has provided two recent signals suggesting that we should generally be loath to impose racial balancing obligations on institutions that, like Delta, have never been found guilty of engaging in racial discrimination.
*338 First, in Parents Involved in Community Schools v. Seattle School District No. 1 , 551 U.S. 701, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007), the Court held unconstitutional certain racial balancing measures taken by the Seattle and Jefferson County school districts. As Chief Justice Roberts explained on behalf of himself and three other justices: "Accepting racial balancing as a compelling state interest would justify the imposition of racial proportionality throughout American society, contrary to our repeated recognition that '[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.' " Id. at 730, 127 S.Ct. 2738 (quoting Miller v. Johnson , 515 U.S. 900, 911, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) ).
The racial balancing policies challenged here are indistinguishable from those held unconstitutional in Parents Involved , as the parties acknowledged at oral argument. Both the United States and the School Board nevertheless contend that Parents Involved should not apply to Delta, because the Seattle and Jefferson County school districts are not currently subject to desegregation orders. But that only begs the question why Parents Involved would not also apply to a charter school that likewise has never been found guilty of segregation. As the Chief Justice put it: "For schools that never segregated on the basis of race , ... the way to achieve a system of determining admission to the public schools on a nonracial basis is to stop assigning students on a racial basis. The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." Id. at 747, 127 S.Ct. 2738 (emphasis added, quotations and citations omitted).
Second, in Shelby County v. Holder , 570 U.S. 529, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013), the Court held that longstanding measures to eradicate the effects of historical discrimination must be justified by contemporary realities. Decision-makers ought to "identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions," rather than "rely simply on the past." Id. at 553, 133 S.Ct. 2612.
A court order that treats Delta as a modern-day manifestation of Concordia Parish and its shameful legacy of racial segregation, without sufficient evidentiary basis, risks running afoul of this standard. In defense of the court order, the United States equates new charter schools like Delta to a so-called "splinter" school district-that is, "a new school district [carved out] from an existing district that has not yet completed the process of dismantling a system of enforced racial segregation." Wright v. Council of City of Emporia , 407 U.S. 451, 453, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972).
But Delta is quite different from a splinter district. The splinter district cases deal with steps taken by "state or local officials" to carve new public school districts out of old ones-not private citizens seeking to operate a charter school within geographic proximity of an existing district. United States v. Scotland Neck City Bd. of Ed. , 407 U.S. 484, 489, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972). There is no institutional continuity between the Concordia Parish public school system and Delta. To the contrary, Delta appears to operate over the opposition of Concordia Parish. Accordingly, if presented with these facts, the Supreme Court might well find that Delta is an entirely new entrant into the Concordia Parish community, and should not be presumed discriminatory absent evidence of its own wrongdoing.
*339 III.
If the School Board believes Delta is masking its true aims and engaged in the evil institution of racial segregation, it should present its evidence to the district court and request a finding of racial discrimination. Indeed, the Board would appear to welcome such an opportunity. It suggests, for example, that it is no coincidence that Delta uses the same facilities as a previous "segregationist academy." For its part, Delta responds that it is simply cheaper to use buildings that have already been built to serve as classrooms, than to construct new classrooms from scratch. Both sides deserve full and fair opportunity to present their case to the district court. Just as Delta can move to modify the racial balancing provisions as unconstitutional, the Board can defend those provisions as necessary due to racial discrimination by Delta.
In the absence of a judicial finding of discrimination, however, it remains an open question whether these racial balancing provisions can satisfy the strict scrutiny required by the Supreme Court, based on nothing more than geographic proximity to a school district subject to a decades-old desegregation order that long predates the birth of the charter school.
The Supreme Court is strict, because the harm is stark. No matter how well-intentioned the policy may be, injury is a mathematical certainty, because educational admissions is a zero-sum game: When a school offers admission based on a student's race, it denies admission based on a student's race. For every person you "help" due to race, you necessarily hurt another person due to race. And only by speaking plainly do we ensure fidelity to the Constitution.
* * *
Over six decades have passed since Brown v. Board of Education , 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Yet our Nation continues to struggle to live up to its central vision-that no matter the circumstances of one's birth, every child deserves a shot at the American Dream-and the key to social mobility is a good education. As Brown observes, "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity ... must be made available to all on equal terms ." Id. at 493, 74 S.Ct. 686 (emphasis added). See also Brown v. Board of Education , 349 U.S. 294, 300-01, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) ("[a]t stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory" and "nonracial basis"). The debate over the meaning and implementation of this timeless vision remains as hotly contested today as ever.
I nevertheless join my colleagues in saving these weighty issues for another day. I do so not despite, but precisely because of, the fundamental importance of these issues. The continuing legacy of Brown within the context of newly formed charter schools is a significant constitutional question-and, as the parties agree, an uncharted one-that deserves more thorough and rigorous analysis and treatment than has been provided to the district court in this case to date.