IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-762

Filed: 18 February 2020

Wake County, No. 18 CVS 15292

JABARI HOLMES, FRED CULP, DANIEL E. SMITH, BRENDON JADEN PEAY, SHAKOYA CARRIE BROWN, and PAUL KEARNEY, SR., Plaintiffs

v.

TIMOTHY K. MOORE *in his official capacity as Speaker of the North Carolina House of Representatives*; PHILIP E. BERGER *in his official capacity as President Pro Tempore of the North Carolina Senate*; DAVID R. LEWIS *in his official capacity as Chairman of the House Select Committee on Elections for the 2018 Third Extra Session*; RALPH E. HISE *in his official capacity as Chairman of the Senate Select Committee on Elections for the 2018 Third Extra Session*; THE STATE OF NORTH CAROLINA; and THE NORTH CAROLINA STATE BOARD OF ELECTIONS, Defendants

Appeal by Plaintiffs from Order entered 19 July 2019 by Judges Nathaniel J. Poovey, Vince M. Rozier, Jr., and Michael J. O'Foghludha in Wake County Superior Court. Heard in the Court of Appeals 22 January 2020.

*Southern Coalition for Social Justice, by Jeffrey Loperfido and Allison J. Riggs, and Paul, Weiss, Rifkind, Wharton & Garrison LLP, by Andrew J. Ehrlich, Ethan Merel, Apeksha Vora, Jane B. O'Brien, Paul D. Brachman, Jessica Anne Morton, and Laura E. Cox, pro hac vice, for plaintiffs-appellants.*

*Phelps Dunbar LLP, by Nathan A. Huff, and Cooper & Kirk, PLLC, by David H. Thompson, Peter A. Patterson, and Nicole Frazer Reaves, pro hac vice, and by Nicole J. Moss, for legislative defendants-appellees.*

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Olga E. Vysotskaya de Brito, Senior Deputy Attorney General Amar Majmundar, and Special Deputy Attorney General Paul M. Cox, for defendants-appellees the State of North Carolina and the North Carolina State Board of Elections.*

HAMPSON, Judge.

## **Factual and Procedural Background**

Jabari Holmes, Fred Culp, Daniel E. Smith, Brendon Jaden Peay, Shakoya Carrie Brown, and Paul Kearney, Sr. (collectively, Plaintiffs)[1] appeal from an Order Denying Plaintiffs' Motion for Preliminary Injunction and Denying in Part and Granting in Part Defendants' Motions to Dismiss (Order) filed on 19 July 2019, concluding in part Plaintiffs were not entitled to a preliminary injunction enjoining Senate Bill 824, titled "An Act to Implement the Constitutional Amendment Requiring Photographic Identification to Vote," (S.B. 824),[2] which established, *inter alia*, photographic voter identification (photo ID) requirements for elections in North Carolina. The Record before us tends to show the following:

---

[1] On 18 September 2019, Plaintiffs filed a Motion with this Court requesting we take judicial notice of Plaintiff Shakoya Carrie Brown's Notice of Voluntary Dismissal filed with the trial court on 16 September 2019. However, Plaintiffs have failed to make a motion to amend the Record under N.C.R. App. P. 9(b)(5), which is "the proper method to request amendment of the record[.]" *Horton v. New South Ins. Co.*, 122 N.C. App. 265, 267, 468 S.E.2d 856, 857 (1996). Further, "we will not take judicial notice of a document outside the record when no effort has been made to include it." *Id.* at 268, 468 S.E.2d at 858. Accordingly, we deny Plaintiffs' Motion. Plaintiffs also have not filed any motion in this Court requesting Ms. Brown be dismissed or permitted to withdraw from this appeal.

[2] S.B. 824 was subsequently enacted as North Carolina Session Law 2018-144. *See* 2018 N.C. Sess. Law 144 (N.C. 2018) (codified as amended at N.C. Gen. Stat. §§ 20-37.7; 130A-93.1; 161-10; 163A-741, -821, -867, -869, -869.1, -913, -1133-34, -1137, -1145.1-3, -1298, -1300, -1303, -1306-10, -1315, -1368, -1389, -1411, -1520 (2018)); *see also* 2018 N.C. Sess. Law 146, § 3.1(a) (N.C. 2018) (authorizing the recodification of Chapter 163A into Chapters 163, 138A, and 120C). The challenged provisions of S.B. 824 are now found at Sections 163-82.8A (photo-ID requirement), -166.16 (list of valid photo IDs), -166.17 (student-ID requirements), -166.18 (government-ID requirements), -229 (absentee ballots), -230.2 (absentee ballots), -166.7, -227.2, and -22 of our General Statutes. *See* N.C. Gen. Stat. §§ 163-82.8A; -166.16-18; -229; -230.2; -166.7; -227.2; -22 (2019). Because the parties refer to Session Law 824 as S.B. 824, we too refer to it as S.B. 824.

On 6 November 2018, a majority of North Carolina voters, approximately 55%, voted in favor of amending Article VI of the North Carolina Constitution by requiring voters to present qualifying photo ID before casting a ballot. Sections 2(4) and 3(2) of Article VI of the North Carolina Constitution now provide:

> Voters offering to vote in person shall present photographic identification before voting. The General Assembly shall enact general laws governing the requirements of such photographic identification, which may include exceptions.

N.C. Const. art. VI, §§ 2(4), 3(2).

Less than a month after approval of this constitutional Amendment and during a "lame-duck" legislative session, the General Assembly passed S.B. 824 as implementing legislation on 6 December 2018. Governor Roy Cooper (Governor Cooper) vetoed S.B. 824 on 14 December 2018. Five days later, the General Assembly reconvened and overrode Governor Cooper's veto. Thus, on 19 December 2018, S.B. 824 became law. 2018 N.C. Sess. Law 144.

At its core, S.B. 824 requires all voters, both those voting in person or by absentee ballot, "produce" an acceptable form of identification "that contain[s] a photograph of the registered voter[.]" *Id.* § 1.2(a); *see also id.* § 1.2(e). Section 1.2(a) designates ten different forms of acceptable IDs:

1. North Carolina driver's licenses;

2. Certain nontemporary IDs issued by the Division of Motor Vehicles (DMV);

3.   United States passports;

4.   North Carolina voter photo-ID cards;

5.   Tribal enrollment cards issued by a state or federally recognized tribe;

6.   Certain student IDs issued by post-secondary institutions;

7.   Certain employee IDs issued by a state or local government entity;

8.   Out-of-state driver's licenses or special ID cards for nonoperators for newly registered voters;

9.   Military IDs issued by the United States government; and

10.  Veterans IDs issued by the United States Department of Veterans Affairs.

*Id.* § 1.2(a).  Under this Section, the first eight forms of ID may be used only if "valid and unexpired, or . . . expired for one year or less[.]"  *Id.*  Whereas, military and veterans IDs may be used "regardless of whether the identification contains a printed expiration or issuance date[.]"  *Id.*  Moreover, if a voter is sixty-five years old or older, any expired form of identification allowed above is deemed valid if it was unexpired on the voter's sixty-fifth birthday.  *Id.*  Student and government-employee IDs, however, do not automatically qualify as acceptable IDs.  Instead, post-secondary institutions and public employers must apply to the North Carolina State Board of Elections for approval of their IDs.  *See id.* §§ 1.2(b)-(c) (containing original approval

process); *see also* 2019 N.C. Sess. Law 22, §§ 2-3 (N.C. 2019) (amending approval process).

S.B. 824 also contains two ways for voters to obtain free photo-ID cards. First, a registered voter may visit their county board of elections and receive an ID "without charge" so long as the voter provides their name, date of birth, and the last four digits of their social security number. 2018 N.C. Sess. Law 144, § 1.1(a). Second, under Section 1.3(a), voters over the age of seventeen may obtain free of charge a nonoperator-ID card from the DMV as long as the voter provides certain documentation, such as a birth certificate. *Id.* § 1.3(a). If the voter does not have this documentation, the State must supply it free of charge. *See id.* § 3.2(b). Similarly, if a registered voter's driver's license has been "seized or surrendered due to cancellation, disqualification, suspension, or revocation[,]" the DMV must automatically mail the voter a "special identification card" that can be used for voting. *Id.* § 1.3(a).

Lastly, S.B. 824 contains several exemptions to its photo-ID requirements. Exemptions exist for voters who (1) have "a religious objection to being photographed," (2) are victims of a recent natural disaster, or (3) "suffer[ ] from a reasonable impediment that prevents [them] from presenting photograph identification[.]" *Id.* § 1.2(a). If one of these circumstances applies, a voter may cast a "provisional ballot" by "complet[ing] an affidavit under penalty of perjury at the

voting place" affirming their identity and their reason for not presenting photo ID. *Id.* After submitting this affidavit, the county board of elections "shall find that the provisional ballot is valid unless the county board has grounds to believe the affidavit is false." *Id.* In a similar vein, if a registered voter fails to bring their acceptable ID to the polls, the voter may "cast a provisional ballot that is counted only if the registered voter brings an acceptable form of photograph identification . . . to the county board of elections no later than the end of business on the business day prior to the canvass . . . of elections[.]" *Id.*

On the same day S.B. 824 became law, Plaintiffs filed their Verified Complaint (Complaint) in this action in Wake County Superior Court against Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives; Philip E. Berger, in his official capacity as Present Pro Tempore of the North Carolina Senate; David R. Lewis, in his official capacity as Chairman of the House Select Committee on Elections for the 2018 Third Extra Session; Ralph E. Hise, in his official capacity as Chairman of the Senate Select Committee on Elections for the 2018 Third Extra Session (collectively, Legislative Defendants); the State of North Carolina; and the North Carolina State Board of Elections (collectively, State Defendants).[3] In their Complaint, Plaintiffs alleged six causes of action claiming S.B. 824 facially violates various provisions of the North Carolina Constitution. In particular, Plaintiffs

_____

[3] We refer to both Legislative and State Defendants collectively as Defendants.

alleged S.B. 824 violates the Equal Protection Clause found in Article I, Section 19 of the North Carolina Constitution, claiming S.B. 824 was enacted with racially discriminatory intent and thereby intentionally discriminates against voters of color (Discriminatory-Intent Claim). The same day, Plaintiffs also filed a Motion for Preliminary Injunction (Preliminary-Injunction Motion) seeking a preliminary injunction to prevent "Defendants from implementing in any regard, relying on, enforcing, conducting elections, or preparing to conduct any elections in conformity with the voter ID provisions of [S.B.] 824, specifically Parts I and IV." In response, Legislative and State Defendants each filed Motions to Dismiss on 22 January and 21 February 2019, respectively.

The Chief Justice of the North Carolina Supreme Court transferred this case to a three-judge panel on 19 March 2019. *See* N.C. Gen. Stat. § 1-267.1(a1) (2019) (requiring the transfer of "any facial challenge to the validity of an act of the General Assembly" to a three-judge panel of the Superior Court of Wake County). After hearing arguments from the parties, the three-judge panel entered its Order on Defendants' Motions to Dismiss and Plaintiffs' Preliminary-Injunction Motion on 19 July 2019. In its Order, the trial court dismissed all of Plaintiffs' claims except for Plaintiffs' Discriminatory-Intent Claim, concluding "Plaintiffs have made sufficient factual allegations to support" this Claim. However, a majority of the panel denied Plaintiffs' Preliminary-Injunction Motion, concluding "Plaintiffs have failed to

demonstrate a likelihood of success on the merits" of their Discriminatory-Intent Claim. One judge dissented from the portion of the Order denying Plaintiffs' Preliminary-Injunction Motion because, in his opinion and based on the evidence before the panel, "Plaintiffs have shown a reasonable probability of success on the merits [of Plaintiffs' Discriminatory-Intent Claim] and that the issuance of an injunction is necessary to protect Plaintiffs' rights during the litigation." (citation omitted). On 24 July 2019, Plaintiffs filed Notice of Appeal from the trial court's Order. *See* N.C. Gen. Stat. § 7A-27(b)(3)(a) (2019).

## **Appellate Jurisdiction**

The trial court's Order in this case both partially dismissed Plaintiffs' claims and denied the Preliminary-Injunction Motion. This Order does not contain a certification of the dismissed claims for immediate appeal under Rule 54(b), and Plaintiffs do not bring forward any arguments regarding the dismissed claims. Thus, we do not address the trial court's dismissal of those claims and leave that aspect of the Order undisturbed. Rather, Plaintiffs only contend the trial court erred in denying the Preliminary-Injunction Motion.

The denial of a preliminary injunction is interlocutory in nature. *See A.E.P. Industries v. McClure*, 308 N.C. 393, 400, 302 S.E.2d 754, 759 (1983) (citation omitted); *see also Cagle v. Teachy*, 111 N.C. App. 244, 247, 431 S.E.2d 801, 803 (1993) ("An interlocutory order . . . is one made during the pendency of an action which does

not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy." (citation omitted)). A party may appeal an interlocutory order if it "deprives the appellant of a substantial right which he would lose absent a review prior to final determination." *A.E.P. Industries*, 308 N.C. at 400, 302 S.E.2d at 759.

A substantial right has consistently been defined as "a legal right affecting or involving a matter of substance as distinguished from matters of form: a right materially affecting those interests which one is entitled to have preserved and protected by law: a material right." *Gilbert v. N.C. State Bar*, 363 N.C. 70, 75, 678 S.E.2d 602, 605 (2009) (alteration, citation, and quotation marks omitted). "The burden is on the appellant to establish that the order deprives the appellant of a substantial right which would be jeopardized absent a review prior to a final determination on the merits." *Coates v. Durham Cty.*, ___ N.C. App. ___, ___, 831 S.E.2d 392, 394 (2019) (citation and quotation marks omitted). "We consider whether a right is substantial on a case-by-case basis." *Gilbert*, 363 N.C. at 75, 678 S.E.2d at 605.

Here, Plaintiffs assert the Order affects a substantial right of theirs—namely, "the right to vote on equal terms and free from intentional discrimination[.]" Indeed, our Supreme Court has recognized: "The right to vote is one of the most cherished rights in our system of government, enshrined in both our Federal and State

Constitutions." *Blankenship v. Bartlett*, 363 N.C. 518, 522, 681 S.E.2d 759, 762 (2009) (citing U.S. Const. amend. XV; N.C. Const. art. I, §§ 9, 10, 11); *see also Wesberry v. Sanders*, 376 U.S. 1, 17, 11 L. Ed. 2d 481, 492 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined.").  More specifically, though, Plaintiffs contend their substantial right—"to go to the polls in the March 2020 primary [and in the fall general elections] under laws that were not designed to make it harder for them and other voters of color to vote"—will be lost absent review and imposition of a preliminary injunction by this Court.

In contrast, Legislative Defendants argue no substantial right of these *individual* Plaintiffs will be lost absent review because all Plaintiffs will be able to vote under S.B. 824.  However, Legislative Defendants fundamentally miss the point—and, indeed, the substantial right that would be lost absent appeal.  "In decision after decision, [the United States Supreme] Court has made clear that a citizen has a constitutionally protected right to participate in elections on an *equal basis* with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336, 31 L. Ed. 2d 274, 280 (1972) (emphasis added) (citations omitted).  Thus, where Plaintiffs have sufficiently alleged, as discussed in more detail *infra*, S.B. 824 denies Plaintiffs the "right to participate in elections on an equal basis with other citizens

in [North Carolina]" because S.B. 824's restrictions, which were enacted with discriminatory intent, disproportionately impact African American voters'—and thus Plaintiffs'—ability to vote in comparison to white voters, Plaintiffs have demonstrated a substantial right that will be lost absent immediate appeal. *Id.* (citations omitted); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 229-30 (4th Cir. 2014) (addressing an interlocutory appeal from a district court's denial of a preliminary injunction where the plaintiffs challenged H.B. 589, North Carolina's previous voter-ID-requirement law, on the grounds that it violated equal protection provisions of the United States Constitution). This is so because it is the right to participate in elections on an *equal* basis that is substantial; accordingly, whether Plaintiffs could conceivably still participate in the elections—by jumping through the allegedly discriminatory hoops of S.B. 824—is, in and of itself, not determinative of whether or not S.B. 824 negatively affects the substantial right claimed by Plaintiffs in this case.[4]

---

[4] In a similar vein, Legislative Defendants assert for these same reasons—*i.e.*, Plaintiffs *could* still vote under S.B. 824—that Plaintiffs necessarily lack standing to challenge S.B. 824 because they have "shown no likelihood of harm." However, just as with the substantial-right analysis, Legislative Defendants again miss the mark regarding Plaintiffs' alleged actual injury, which is the discriminatory burdens S.B. 824 imposes on Plaintiffs' right to participate in elections on an equal basis. *See, e.g.*, *Fla. Gen. Contractors v. Jacksonville*, 508 U.S. 656, 666, 124 L. Ed. 2d 586, 597 (1993) (explaining in the context of an equal protection claim, the "injury in fact" was the "denial of equal treatment . . . not the ultimate inability to obtain the benefit" (citation omitted)). Here, Plaintiffs' alleged injury in fact is the denial of equal treatment regarding Plaintiffs' ability to comply with S.B. 824's requirements, which Plaintiffs' have sufficiently alleged were enacted with discriminatory intent and disproportionately impact African Americans. That Plaintiffs may ultimately be able to vote in accordance with S.B. 824's requirements is not determinative of whether compliance with S.B. 824's commands results in an injury to Plaintiffs.

Lastly, on 31 December 2019, a federal district court granted a preliminary injunction enjoining, *inter alia*, S.B. 824's voter-ID provisions, concluding the plaintiffs in that case had satisfied their burden of showing a likelihood of success on their claim that these provisions were impermissibly motivated, at least in part, by discriminatory intent in violation of the Equal Protection Clause of the United States Constitution. *See N.C. State Conference of the NAACP v. Cooper*, ___ F. Supp. 3d ___, ___ (M.D.N.C. 2019). At oral arguments in the present case, Legislative Defendants argued the federal district court's granting of a preliminary injunction divests this Court of jurisdiction because Plaintiffs can no longer show a substantial right that will be lost given the fact that an injunction will remain in place at least through the March primaries.

However, the federal district court's injunction is merely temporary, and the timing of any trial and decision on the merits in either the state or federal litigation is uncertain. Moreover, Plaintiffs' Discriminatory-Intent Claim here solely invokes protections under our state Constitution. *See Evans v. Cowan*, 122 N.C. App. 181, 183-84, 468 S.E.2d 575, 577 (requiring our state courts to make an "independent determination" of a plaintiff's claims under the North Carolina Constitution (citations omitted)), *aff'd per curiam*, 345 N.C. 177, 477 S.E.2d 926 (1996). Therefore, we conclude this Court has jurisdiction to address the merits of Plaintiffs' appeal from the denial of the Preliminary-Injunction Motion.

## Issue

The sole issue on appeal is therefore whether the trial court erred in denying Plaintiffs' Motion to preliminarily enjoin S.B. 824's voter-ID requirements.

## Analysis

### I. Standard of Review

In reviewing a trial court's order denying a preliminary injunction, our Court has explained our standard of review:

> A preliminary injunction is an extraordinary measure taken by a court to preserve the status quo of the parties during litigation. It will be issued only (1) if a plaintiff is able to show *likelihood* of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation. In reviewing the denial of a preliminary injunction, an appellate court is not bound by the trial court's findings of fact, but may weigh the evidence anew and enter its own findings of fact and conclusions of law; our review is *de novo*. *De novo* review requires us to consider the question anew, as if not previously considered or decided, and such a review of the denial of a preliminary injunction is based upon the facts and circumstances of the particular case.

*Kennedy v. Kennedy*, 160 N.C. App. 1, 8, 584 S.E.2d 328, 333 (2003) (citations and quotation marks omitted).

### II. Discriminatory-Intent Claim

Plaintiffs allege S.B. 824 violates the Equal Protection Clause of the North Carolina Constitution because it intentionally discriminates against African

American voters. *See* N.C. Const. art. I, § 19 (guaranteeing "[n]o person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin").[5] Specifically, Plaintiffs assert S.B. 824 "is unconstitutional because it was enacted with the discriminatory intent to exclude voters of color from the electoral process."

The parties generally agree the United States Supreme Court's decision in *Arlington Heights v. Metropolitan Housing Corp.* and its progeny control the question of whether Plaintiffs are entitled to a preliminary injunction based on their Discriminatory-Intent Claim. *See* 429 U.S. 252, 50 L. Ed. 2d 450 (1977).

> In [*Arlington Heights*], the Supreme Court addressed a claim that racially discriminatory intent motivated a facially neutral governmental action. The Court recognized that a facially neutral law, like the one at issue here, can be motivated by invidious racial discrimination. *Id.* at 264-66[, 50 L. Ed. 2d at 464-65]. If discriminatorily motivated, such laws are just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race. *Id.*
>
> When considering whether discriminatory intent motivates a facially neutral law, a court must undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." [*Id.* at 266, 50 L. Ed. 2d at 465.] Challengers need not show that discriminatory purpose was the "sole[ ]" or even a "primary" motive for the legislation, just that it was "*a* motivating

---

[5] Although Plaintiffs only allege violations of our state Constitution and not the federal Constitution, our Supreme Court has recognized the "Equal Protection Clause of Article I, § 19 of the Constitution of North Carolina is functionally equivalent to the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States." *White v. Pate*, 308 N.C. 759, 765, 304 S.E.2d 199, 203 (1983) (citation omitted). Accordingly, we utilize decisions under both Constitutions to analyze the validity of Plaintiffs' Discriminatory-Intent Claim. *See, e.g., Libertarian Party of N.C. v. State*, 365 N.C. 41, 42, 707 S.E.2d 199, 200-01 (2011) ("adopt[ing] the United States Supreme Court's analysis for determining the constitutionality of ballot access provisions").

factor." *Id.* at 265-66[, 50 L. Ed. 2d at 465] (emphasis added). Discriminatory purpose "may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." [*Washington v. Davis*, 426 U.S. 229, 242, 48 L. Ed. 2d 597, 608-09 (1976).] But the ultimate question remains: did the legislature enact a law "because of," and not "in spite of," its discriminatory effect. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, [60 L. Ed. 2d 870, 888] (1979) [(footnote omitted)].

In *Arlington Heights*, the Court set forth a nonexhaustive list of factors to consider in making this sensitive inquiry. These include: "[t]he historical background of the [challenged] decision"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from normal procedural sequence"; the legislative history of the decision; and of course, the disproportionate "impact of the official action—whether it bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266-67[, 50 L. Ed. 2d at 465-66] (internal quotation marks omitted).

In instructing courts to consider the broader context surrounding the passage of legislation, the Court has recognized that "[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." In a vote denial case such as the one here, where the plaintiffs allege that the legislature imposed barriers to minority voting, this holistic approach is particularly important, for "[d]iscrimination today is more subtle than the visible methods used in 1965." Even "second-generation barriers" to voting, while facially race neutral, may nevertheless be motivated by impermissible racial discrimination. [*Shelby County v. Holder*, 570 U.S. 529, 563-64, 186 L. Ed. 2d 651, 677 (2013)] (Ginsberg, J., dissenting) (cataloguing ways in which facially neutral voting laws continued to discriminate against minorities even after passage of Voting Rights Act).

"Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the

law would have been enacted without this factor." [*Hunter v. Underwood*, 471 U.S. 222, 228, 85 L. Ed. 2d 222, 228 (1985) (citation omitted).] When determining if this burden has been met, courts must be mindful that "racial discrimination is not just another competing consideration." *Arlington Heights*, 429 U.S. at 265-66[, 50 L. Ed. 2d at 465]. For this reason, the judicial deference accorded to legislators when "balancing numerous competing considerations" is "no longer justified." *Id.* Instead, courts must scrutinize the legislature's *actual* non-racial motivations to determine whether they *alone* can justify the legislature's choices. If a court finds that a statute is unconstitutional, it can enjoin the law.

*N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 220-21 (4th Cir. 2016) (alterations in original) (citations omitted).

Both Defendants, however, take issue with several parts of this analysis and suggest differing standards should apply. First, Legislative Defendants, citing *Arlington Heights*, argue that for Plaintiffs to carry their burden of proving S.B. 824 is racially discriminatory, "Plaintiffs must prove *both* racially discriminatory impact *and* 'racially discriminatory intent or purpose.'" Whereas, State Defendants contend that because Plaintiffs raise a facial challenge to S.B. 824, which generally requires a showing that "there are no circumstances under which the statute might be constitutional" to prevail, quoting *N.C. State Bd. of Educ. v. State*, 371 N.C. 170, 180, 814 S.E.2d 67, 74 (2018) (citation and quotation marks omitted), and because we must presume S.B. 824, a North Carolina statute, is constitutional and therefore afford it "great deference," quoting *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 167, 594 S.E.2d 1, 7 (2004) (citation and quotation marks omitted), "Plaintiffs must show that it is

impossible to enforce [S.B.] 824 in a way that does *not* discriminate against voters based on race" in order to succeed on the merits. However, both Defendants misinterpret Plaintiffs', and their own, burden under a challenge, such as this, to a facially neutral law allegedly motivated by a discriminatory purpose.

First, Legislative Defendants misconstrue the initial burden under the burden-shifting framework established by *Arlington Heights*, which first requires "[p]roof of racially discriminatory intent or purpose . . . to show a violation of the Equal Protection Clause." 429 U.S. at 265, 50 L. Ed. 2d at 464. To aid in this task, *Arlington Heights* provides a list of nonexhaustive factors for courts to consider, and one of those factors is the disproportionate "impact of the official action—whether it bears more heavily on one race than another[, *i.e.*, discriminatory impact.]" *Id.* at 266, 50 L. Ed. 2d at 465 (citation and quotation marks omitted). Stated another way, discriminatory *impact* can support an inference of discriminatory *intent or purpose*; however, only "discriminatory *intent or purpose is required* to show a violation of the Equal Protection Clause." *Id.* at 265, 50 L. Ed. 2d at 464 (emphasis added); *see also Davis*, 426 U.S. at 242, 48 L. Ed. 2d at 608-09 (holding discriminatory intent or purpose "may often be inferred from the totality of the relevant facts, including the fact, if it is true, that *the law bears more heavily on one race than another*" (emphasis added)).[6]

---

[6] Legislative Defendants' argument rests almost entirely on the United States Supreme Court's pronouncement in *Palmer v. Thompson*—"[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." 403

Second, State Defendants misunderstand the presumptions, or lack thereof, afforded to the law's defenders at the second stage of the *Arlington Heights* analysis. "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228, 85 L. Ed. 2d at 228 (citation omitted). Although State Defendants correctly point out North Carolina caselaw generally "gives acts of the General Assembly great deference," *Rhyne*, 358 N.C. at 167, 594 S.E.2d at 7 (citation and quotation marks omitted), such deference is not warranted when the burden shifts to a law's defender after a challenger has shown the law to be the product of a racially discriminatory purpose or intent. *See Arlington Heights*, 429 U.S. at 265-66, 50 L. Ed. 2d at 465 ("When there is proof that a discriminatory purpose has been a motivating factor in the decision, . . . *judicial deference is no longer justified*." (emphasis added) (footnote

---

U.S. 217, 224, 29 L. Ed. 2d 438, 444 (1971). We first note *Palmer* was decided before both *Davis* and *Arlington Heights* and that both decisions seem to nullify *Palmer*'s pronouncement. Furthermore, although the Supreme Court has never expressly overturned *Palmer*, the Eleventh Circuit has previously noted the decision's "holding simply has not withstood the test of time, even in the Fourteenth Amendment equal protection context." *Church of Scientology v. City of Clearwater*, 2 F.3d 1514, 1529 (11th Cir. 1993) (citations omitted). In any event and as discussed *infra*, Plaintiffs have sufficiently alleged *some* disproportionate impact caused by S.B. 824, which is sufficient, along with the presence of the other *Arlington Heights* factors, to support a showing of discriminatory intent under *Arlington Heights*'s totality-of-the-circumstances test. *See McCrory*, 831 F.3d at 231 ("Showing disproportionate impact, even if not overwhelming impact, suffices to establish *one* of the circumstances evidencing discriminatory intent." (footnote omitted)).

omitted)).[7]  Accordingly, the general standard applied to facial constitutional challenges is also inapplicable because the *Arlington Heights* framework dictates the law's defenders must instead "demonstrate that the law would have been enacted without" the alleged discriminatory intent.  *Hunter*, 471 U.S. at 228, 85 L. Ed. 2d at 228 (citation omitted).

Therefore, we apply the framework created by *Arlington Heights* and succinctly summarized by *McCrory*.  Accordingly, we turn to the *Arlington Heights* factors to determine whether Plaintiffs have shown—at this preliminary stage on the current Record—a likelihood of prevailing on the merits of their Discriminatory-Intent Claim.

*A. Historical Background*

Under *Arlington Heights*, a court reviewing a discriminatory-intent claim should consider "[t]he historical background of the decision" challenged as racially discriminatory.  429 U.S. at 267, 50 L. Ed. 2d at 465 (citations omitted).  "A historical pattern of laws producing discriminatory results provides important context for

---

[7] In this sense, *Arlington Heights*'s burden-shifting framework is congruent with our Supreme Court's "strong presumption that acts of the General Assembly are constitutional[.]"  *Stephenson v. Bartlett*, 355 N.C. 354, 362, 562 S.E.2d 377, 384 (2002) (citations omitted).  Under an *Arlington Heights* analysis, a plaintiff must *first* show discriminatory intent motivated the challenged act, and once this initial burden has been overcome, "judicial deference is no longer justified."  429 U.S. at 265-66, 50 L. Ed. 2d at 465 (footnote omitted).  Similarly, although under our caselaw we initially afford a "strong presumption" in favor of a law's constitutionality, this presumption nevertheless can be overcome, at which point deference is likewise not warranted.  *See Stephenson*, 355 N.C. at 362, 562 S.E.2d at 384 ("Although there is a strong presumption that acts of the General Assembly are constitutional, *it is nevertheless the duty of this Court, in some instances, to declare such acts unconstitutional*." (emphasis added) (citations omitted)).

determining whether the same decisionmaking body has also enacted a law with discriminatory purpose." *McCrory*, 831 F.3d at 223-24 (citation omitted). As the *McCrory* Court stated: "Examination of North Carolina's history of race discrimination and recent patterns of official discrimination, combined with the racial polarization of politics in the state, seems particularly relevant in this inquiry." *Id.* at 223.

Both the United States Supreme Court and the Fourth Circuit have recently summarized the historical context in which this case arises. *See Shelby Cty.*, 570 U.S. at 552, 186 L. Ed. 2d at 670; *McCrory*, 831 F.3d at 223-25. As *Shelby County* recognized, "[i]t was in the South that slavery was upheld by law until uprooted by the Civil War, that the reign of Jim Crow denied African-Americans the most basic freedoms, and that state and local governments worked tirelessly to disenfranchise citizens on the basis of race." 570 U.S. at 552, 186 L. Ed. 2d at 670. Just as with other states in the South, "North Carolina has a long history of race discrimination generally and race-based vote suppression in particular." *McCrory*, 831 F.3d at 223.

To help combat this "extraordinary problem" and ensure African Americans and other minorities the right to vote, Congress enacted the Voting Rights Act of 1965 (VRA). *Shelby Cty.*, 570 U.S. at 534, 186 L. Ed. 2d at 659. Under the VRA, Congress "required [certain] States to obtain federal permission before enacting any law related to voting[.]" *Id.* at 535, 186 L. Ed. 2d at 659. In order to obtain "preclearance,"

the State had to demonstrate that their proposed legislation "had neither the purpose nor effect of diminishing the ability of any citizens to vote on account of race or color." *McCrory*, 831 F.3d at 215 (citation and quotation marks omitted). "Forty North Carolina jurisdictions were covered under" this preclearance regime. *Id.* (citation omitted). "During the period in which North Carolina jurisdictions were [subjected to preclearance], African American electoral participation dramatically improved." *Id.*[8] "After years of preclearance and expansion of voting access, by 2013 African American registration and turnout rates had finally reached near-parity with white registration and turnout rates." *Id.* at 214.

The General Assembly's first attempt at a photo-ID law began in 2011. While still subject to preclearance, the General Assembly passed a photo-ID law along strict party lines; however, then-Governor Beverly Perdue vetoed the proposed bill. In her statement accompanying her veto, then-Governor Perdue expressed concern that the "bill, as written, will unnecessarily and unfairly disenfranchise many eligible and legitimate voters." Approximately two years later, the General Assembly again began discussions of another photo-ID law—House Bill 589 (H.B. 589). *See id.* at 227. In

---

[8] In addition to preclearance, challenges to various election laws in North Carolina have also aided in creating more favorable voting conditions for African Americans. For instance, from 1980 to 2013, the Department of Justice "issued over fifty objection letters to proposed election law changes in North Carolina . . . because the State had failed to prove the proposed changes would have no discriminatory purpose or effect." *Id.* at 224 (citations omitted). "During the same period, private plaintiffs brought fifty-five successful cases under [the VRA, resulting in t]en cases end[ing] in judicial decisions finding that electoral schemes . . . across the state had the effect of discriminating against minority voters." *Id.* (citations omitted). "Forty-five cases were settled favorably for plaintiffs out of court or through consent [decrees] that altered the challenged voting laws." *Id.* (citations omitted).

its initial form, H.B. 589's photo-ID requirements were "much less restrictive" than a later version passed after the United States Supreme Court's decision in *Shelby County*. *Id.*; *see also Shelby Cty.*, 570 U.S. at 529, 186 L. Ed. 2d at 651. Indeed, the pre-*Shelby County* version of H.B. 589 included several types of acceptable IDs—such as community college IDs; public-assistance IDs; and federal, state, and local government IDs—that were either removed or limited in the final versions of both H.B. 589 and S.B. 824. *Compare* H.B. 589 (5th ed.), § 4 (N.C. 2013), *with* 2013 N.C. Sess. Law 381, § 2.1 (N.C. 2013), *and* 2018 N.C. Sess. Law 144, § 1.2(a).

On 25 June 2013, the United States Supreme Court issued its opinion in *Shelby County*, which invalidated the preclearance coverage formula and meant "North Carolina no longer needed to preclear changes in its election laws." *McCrory*, 831 F.3d at 216. In response, the General Assembly "requested and received racial data" on the various voting practices within the state and on the types of IDs commonly possessed by its citizenry. *Id.* at 216 (citation omitted). With this racial data in hand, the General Assembly "swiftly expanded an essentially single-issue bill into omnibus legislation[.]" *Id.* (footnote omitted). The result, as described by the Fourth Circuit, was a bill that, *inter alia*, "exclude[d] many of the alternative photo IDs used by African Americans" and "eliminated or reduced registration and voting access tools that African Americans disproportionately used." *Id.* (citations omitted). H.B. 589 was "quickly ratified . . . by strict party-line votes . . . [, and t]he Governor, who was

of the same political party as the party that controlled the General Assembly, promptly signed the bill into law on August 12, 2013." *Id.* at 218 (citations omitted).

Legal challenges to H.B. 589 quickly ensued, alleging the law was "motivated by discriminatory intent" in violation of, *inter alia*, the Fourteenth Amendment's Equal Protection Clause. *Id.* (citation omitted). In *McCrory*, the Fourth Circuit recognized that voting in North Carolina, both historically and currently, is "racially polarized"—*i.e.*, "the race of voters correlates with the selection of a certain candidate or candidates." *Id.* at 214 (citation and quotation marks omitted) (noting African American voters overwhelmingly support Democratic candidates). Such polarization offers a "political payoff for legislators who seek to dilute or limit the minority vote." *Id.* at 222. *McCrory* noted the historical background evidence of H.B. 589 suggested racial polarization played an important role in the enactment of H.B. 589, which "target[ed] African Americans with almost surgical precision[.]" *Id.* at 214, 226.

In light of the historical background of the law, the "hurried pace" with which H.B. 589 was enacted after being relieved of preclearance requirements, the legislature's use of racial data in crafting H.B. 589, and the recent surge in African American voting power, the *McCrory* Court concluded, in enacting H.B. 589, the Republican-controlled General Assembly "unmistakably" sought to "entrench itself . . . by targeting voters who, based on race, were unlikely to vote for the majority party." *Id.* at 223-33. Accordingly, the Fourth Circuit struck down H.B. 589 as

unconstitutional, recognizing the "General Assembly enacted the challenged provisions of [H.B. 589] with discriminatory intent." *Id.* at 215.

In accordance with *McCrory*, the "important takeaway" from this historical background is "that state officials continued in their efforts to restrict or dilute African American voting strength well after 1980 and up to the present day." *Id.* at 225. Further, these cases "highlight the manner in which race and party are inexorably linked in North Carolina[,]" which, according to the Fourth Circuit, "constitutes a critical—perhaps the most critical—piece of historical evidence here." *Id.* As *McCrory* recognized, racial polarization—which creates an "incentive for intentional discrimination in the regulations of elections"—existed in 2013 and played a key role in the General Assembly's decision to enact H.B. 589. *Id.* at 222. The proposed constitutional Amendment, and subsequently S.B. 824, followed on the heels of the *McCrory* decision with little or no evidence on this Record of any change in this racial polarization.[9] More to the point, Plaintiffs' evidence tends to show legislators relied on the same data in enacting S.B. 824 as they did in enacting H.B. 589. Accordingly, the historical context in which S.B. 824 was enacted provides support for Plaintiffs' Discriminatory-Intent Claim and warrants further scrutiny of the intent behind S.B. 824.

---

[9] The Middle District of North Carolina, in its order preliminarily enjoining S.B. 824, actually found "the evidence still shows that the state's electorate was extremely polarized at the time S.B. 824 was enacted and will predictably remain so in the near future[.]" *Cooper*, ___ F. Supp. 3d at ___ (citation omitted).

*B. Sequence of Events*

*Arlington Heights* also directs a court reviewing a discriminatory-intent challenge to consider the "specific sequence of events leading up to the challenged decision[.]" 429 U.S. at 267, 50 L. Ed. 2d at 466 (citations omitted). "In doing so, a court must consider departures from the normal procedural sequence, which may demonstrate that improper purposes are playing a role." *McCrory*, 831 F.3d at 227 (alteration, citation, and quotation marks omitted). These considerations "may shed some light on the decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267, 50 L. Ed. 2d at 466 (citation omitted).

Here, Plaintiffs contend the "unusual sequence of events leading to the passage [of S.B.] 824 support the inference that it was motivated by an improper discriminatory intent." In support of this contention, Plaintiffs point to the testimony in an affidavit of Representative Mary Price "Pricey" Harrison (Representative Harrison) summarizing the legislative process of S.B. 824:

> 8. I also believe that the legislative process leading to the enactment of [S.B.] 824 deviated significantly from proper substantive and procedural legislative practices. The legislative process for [S.B.] 824 followed an abbreviated and inadequately-deliberative pattern that the General Assembly has only in recent years seemed to have adopted for controversial legislation. Instead of allowing for a proper and thorough debate, the legislative process was truncated.
>
> 9. Though North Carolinians approved the ID constitutional amendment in November 2018, mandating voters to show identification upon voting, voters also expressed a desire to

- 25 -

see significant changes in the General Assembly. Republicans lost their veto-proof supermajorities in both the State House and Senate during the 2018 midterm.

10. Yet, instead of allowing newly elected officials to craft enabling legislation in accordance with the approved ID constitutional amendment once they took office, the lame-duck legislature reconvened the 2017-2018 Session in late November of 2018 to take up the task. Legislative leaders expedited the passage of [S.B.] 824 rather than taking the time to ensure the protections of voters' constitutional rights. Consequently, the General Assembly enacted enabling legislation affecting over 7 million registered North Carolina voters—overrode a gubernatorial veto of that legislation—in just over 21 days.

11. Consideration of the enabling legislation for the constitutional amendment began on November 27, 2018 and [S.B.] 824 passed the North Carolina House by a vote of 67-40 on December 5, 2018. Over a span of only 8 days—with only limited debate and outdated data to inform legislative decisions—the General Assembly enacted enabling legislation impacting millions of North Carolinians for years to come.

12. Because of the legislature's failure to consider public input, failure to use updated data, failure to allow a thorough debate, and failure to take into account all implications of the bill's potential impacts on voters, it is my belief that [S.B.] 824 as passed fails to sufficiently balance the need to legislatively implement the ID constitutional amendment with the need to preserve all other rights that the North Carolina Constitution affords.

13. Specifically, the House failed to give adequate notice of the meeting to discuss the proposed language for [S.B.] 824, and circulated the proposed language only the night before its consideration. Several House members, including myself, had to arrange last minute travel back to Raleigh and cancel

other scheduled events and meetings in order to attend the Session.

14. Further, public comment was limited to allow only 30 individuals to speak on the proposed bill. Such a limitation deviates from typical procedure for a bill of this magnitude that relates to fundamental constitutional rights. In my experience, with regard to bills of this magnitude that affect issues such as voting rights or redistricting, the legislature has provided much more opportunity for lengthy and balanced public comment. In this instance, only a few individuals had the opportunity to speak in opposition to the proposed bill. Again, this is a deviation from standard procedure.

15. In my experience, it is a deviation from normal procedure to limit discussion of a bill of this magnitude to just a few hours. The scope of [S.B.] 824 necessitated a significantly extended timeline in order to properly understand its far-reaching implications on the ability of North Carolina citizens to vote.

16. Given the expedited timeline that the General Assembly pursued in passing [S.B.] 824, there was no opportunity—as would be available during a normal legislative process—to access relevant and critical data regarding voter information. It is my understanding that much of the data available to us was outdated. As such, the particulars of [S.B.] 824 fail to accurately reflect the current state of voter specific information in North Carolina.

17. Legislators were presented with data from 2015 for their consideration when enacting [S.B.] 824, rather than more appropriate, up-to-date figures. For example, the General Assembly was presented with significantly outdated "no-match" data demonstrating how many North Carolina voters lacked photo ID as of 2015, and to my knowledge did not even attempt to ascertain how many voters lacked such ID at the time [S.B.] 824 was on the floor for discussion.

18. By contrast, the General Assembly was made aware of data—through a presentation delivered to the Joint Legislative Elections Oversight Committee—that showed [S.B.] 824 would disenfranchise thousands of voters. Nevertheless, the General Assembly enacted [S.B.] 824.

In response, Defendants assert there was nothing unusual about this process because the General Assembly followed its normal protocol in passing S.B. 824. For instance, Senator Joel Ford (Senator Ford) countered it was "not unusual or a departure from the normal political process for the General Assembly to reconvene its 2017-2018 Regular Session to consider" S.B. 824. Senator Ford further iterated the enactment of "S.B. 824 followed a normal legislative process" and that the General Assembly "followed all of its normal rules and procedures in considering and enacting S.B. 824." He also stated the timeframe of its passage and the fact that a "lame-duck legislature" passed the legislation were both "not unusual[.]" However, "a legislature need not break its own rules to engage in unusual procedures." *McCrory*, 831 F.3d at 228.

Specifically, here, as Plaintiffs point out, sixty-one of the legislators who voted in favor of S.B. 824 had previously voted to enact H.B. 589, which was struck down by the Fourth Circuit as motivated by a discriminatory intent. We acknowledge individual legislator's views and motivations can change. However, "discriminatory intent does tend to persist through time[.]" *United States v Fordice*, 505 U.S. 717, 747, 120 L. Ed. 2d 575, 604 (1992) (Thomas, J., concurring) (citation omitted).

Therefore, given the "initially tainted policy of [H.B. 589], it is eminently reasonable to make the [General Assembly] bear the risk of nonpersuasion with respect to intent at some future time[.]" *Id.* at 746, 120 L. Ed. 2d at 604 (citation omitted).

Also persuasive is the fact S.B. 824 was passed in a short timeframe by a lame-duck-Republican supermajority, especially given Republicans would lose their supermajority in 2019 because of seats lost during the 2018 midterm election. At a minimum, this shows an intent to push through legislation prior to losing supermajority status and over the governor's veto. Moreover, the quick passage of S.B. 824 was undertaken with limited debate and public input and without further study of the law's effects on minority voters—notwithstanding the fact H.B. 589 had been recently struck down. Plaintiffs' forecasted evidence demonstrates a number of amendments seeking to ameliorate the impacts of S.B. 824 were also summarily rejected. Thus, Plaintiffs have made a sufficient preliminary showing that even if the General Assembly followed its rules, the process employed in enacting S.B. 824 was nevertheless unusual. *See McCrory*, 831 F.3d at 229.

*C. Legislative History*

Indeed, *Arlington Heights* specifically recognizes that legislative history leading to a challenged law "may be highly relevant [to the question of discriminatory intent], especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." 429 U.S. at 268, 50 L. Ed.

2d at 466. Here, given the lack of a fully developed record at this preliminary-injunction stage, our review of the legislative history is somewhat limited. However, a few observations about S.B. 824's legislative history provide important context to our analysis, further supporting Plaintiffs' claim that discriminatory intent was a motivating factor behind the passage of S.B. 824.

When debating and enacting S.B. 824, the General Assembly neither requested nor received any new, updated data showing the percentages of likely voters who possessed qualifying IDs under S.B. 824. Instead, Plaintiffs have presented evidence showing the General Assembly relied on outdated data from 2015 "rather than seeking out more recent information so as to better understand the implications of [S.B.] 824." In addition, Senator Mike Woodard (Senator Woodard) alleged "the expedited timeline that the General Assembly pursued in passing [S.B.] 824 failed to provide the opportunity—as would be available during a normal legislative process—to access relevant and critical data regarding voter information." Senator Woodard suggested because of "this unnecessarily rushed legislative process that failed to account for the full scope of relevant information[,]" S.B. 824 will likely disenfranchise North Carolina voters.

Further, *McCrory* recognized, as particularly relevant to its discriminatory-intent analysis, "the removal of public assistance IDs in particular was suspect, because a reasonable legislator . . . could have surmised that African Americans

would be more likely to possess this form of ID." 831 F.3d at 227-28 (citation and quotation marks omitted). According to Representative Harrison's affidavit, an amendment to S.B. 824 that "would have enabled the recipients of federal and state public assistance to use their public assistance IDs for voting purposes . . . [was] also rejected." Representative Harrison's affidavit states Representative David Lewis (Representative Lewis) rejected this amendment on the basis "the General Assembly does not have the ability to impose its standards on the federal government[.]" However, "Representative Lewis [also] acknowledged that the same is true for military IDs, [which were] nonetheless included as an acceptable form of photo ID." Defendants counter their proffered reason for not including public-assistance IDs was because they do not always include photographs. However, in light of the express language in *McCrory* and at this stage of the proceeding, the inference remains the failure to include public-assistance IDs was motivated in part by the fact that these types of IDs were disproportionately possessed by African American voters.

Accordingly, at this stage of the proceeding, Plaintiffs have presented some evidence suggesting the General Assembly refused to obtain updated data on the effects of S.B. 824's voter-ID provisions, instead relying on outdated data from 2015, and chose not to include certain types of ID disproportionately held by African Americans. When viewed in context, this legislative history supports Plaintiffs' claim of an underlying motive of discriminatory intent in the enactment of S.B. 824. *See*

*id.* at 230 (recognizing "the choices the General Assembly made with this [racial] data in hand" suggested a discriminatory intent where the General Assembly excluded types of IDs disproportionately possessed by African Americans).

> *D. Impact of the Official Action*

Further, "*Arlington Heights* instructs that courts also consider the 'impact of the official action'—that is, whether 'it bears more heavily on one race than another.' " *Id.* (quoting *Arlington Heights*, 429 U.S. at 266, 50 L. Ed. 2d at 465). On this fourth *Arlington Heights* factor, the *McCrory* Court stated:

> When plaintiffs contend that a law was motivated by discriminatory intent, proof of disproportionate impact is not the sole touchstone of the claim. Rather, plaintiffs asserting such claims must offer other evidence that establishes discriminatory intent in the totality of the circumstances. Showing disproportionate impact, even if not overwhelming impact, suffices to establish *one* of the circumstances evidencing discriminatory intent.

*Id.* at 231 (footnote, citations, and quotation marks omitted).

Here, in support of a showing of disparate impact, Plaintiffs point to the affidavit of their expert witness, Professor Kevin Quinn (Professor Quinn). In his affidavit, Professor Quinn explained his task was "to examine North Carolinians' possession rates of forms of photo identification that comply with the requirements of [S.B.] 824 ("acceptable ID") and to determine whether changes in the voter ID requirement disproportionately impact certain types of North Carolina voters." To aid in this task, Professor Quinn analyzed data from 2014 used in crafting H.B. 589—

contained in a report he created in 2015—because no data on all 2019 ID-possession rates existed, although he did have some data on voter registration in 2019. Professor Quinn averred: "Given the data available to me now, my expert opinion is that the rates of photo ID possession by race and active/inactive status that I documented in my 2015 report remain accurate estimates of the corresponding rates of photo ID possession in 2019." "In 2015, African Americans were more than twice as likely as whites to lack identification required to vote under [H.B.] 589." After looking at the changes between acceptable IDs under H.B. 589 and S.B. 824, Professor Quinn opined, "given the information available at this time, that the differences that do exist are unlikely to have an appreciable effect on the racial disparities in ID possession that I found in my 2015 analysis." Accordingly, Professor Quinn stated S.B. 824 would still have a disproportional impact on African Americans because this class lacks acceptable IDs at a greater rate than white voters. As *McCrory* explained, such a "[s]howing of disproportionate impact, *even if not overwhelming impact*, suffices to establish *one* of the circumstances evidencing discriminatory intent." 831 F.3d at 231 (emphasis added) (footnote omitted). We also note, as the dissenting judge below recognized, the General Assembly's decision to exclude public-assistance and federal-government-issued IDs will likely have a negative effect on African Americans because such types of IDs are "disproportionately held by African Americans." *Id.* at 236 (citation omitted).

Defendants, however, counter by pointing to the fact that under S.B. 824 all voters can obtain a photo ID free of charge or alternatively cast a provisional ballot under the reasonable-impediment provision, contending these ameliorating provisions remedy any disproportionate impact caused by the photo-ID requirements. It is true that S.B. 824 allows a registered voter to visit their county board of elections and receive an ID "without charge" so long as the voter provides their name, date of birth, and the last four digits of their social security number. 2018 N.C. Sess. Law 144, § 1.1(a).

Plaintiffs, however, presented evidence showing the burdens of obtaining a free ID are "significant . . . [and] fall disproportionately on voters of color." For instance, Noah Read (Read), a member of the Alamance County Board of Elections, stated in his affidavit: "Because of the location and lack of transportation to the [County Board of Elections] office, I think that providing free Voter IDs . . . will do little to make it easier for Alamance County citizens who do not have ID from the DMV to obtain a free ID for voting." The Chair of the Lenoir County Board of Elections expressed similar concerns that those without access to public transportation could not obtain a free ID in Lenoir County. As Plaintiffs allege, those who lack public transportation or the means to travel are generally working class and poor voters. Plaintiffs also presented evidence showing African Americans in North Carolina are disproportionately more likely to live in poverty than white citizens. Accordingly,

Plaintiffs' evidence at this stage shows the availability of free IDs does little to alleviate the additional burdens of S.B. 824 where African Americans disproportionately lack the resources to travel and acquire such IDs in comparison to white voters.

As for the reasonable-impediment provision, S.B. 824 allows a voter who lacks qualifying ID to cast a provisional ballot if the voter completes an affidavit under penalty of perjury affirming their identity and identifying their reasonable impediment. 2018 N.C. Sess. Law 144, § 1.2(a). S.B. 824 provides the following types of reasonable impediments:

(1) Inability to obtain photo identification due to:

    a. Lack of transportation.

    b. Disability or illness.

    c. Lack of birth certificate or other underlying documents required.

    d. Work schedule.

    e. Family responsibilities.

(2) Lost or stolen photo identification.

(3) Photo identification applied for but not yet received by the registered voter voting in person.

(4) Other reasonable impediment. If the registered voter checks the "other reasonable impediment" box, a further brief written identification of the reasonable impediment shall be

required, including the option to indicate that State or federal
law prohibits listing the impediment.

*Id.* Once submitted, the voter may cast a provisional ballot that the county board of

elections "shall find . . . is valid unless the [five-member, bipartisan] county board has

grounds to believe the affidavit is false." *Id.* Defendants allege this reasonable-

impediment provision renders S.B. 824 constitutional because it allows all voters to

vote.

While it may be true that African American voters without a qualifying ID

could still be able to vote by using the reasonable-impediment provision, this fact does

not necessarily fully eliminate the disproportionate impact on African American

voters resulting from both S.B. 824's voter-ID provisions and the reasonable-

impediment provision. As Plaintiffs have shown, the voter-ID provisions likely will

have a negative impact on African Americans because they lack acceptable IDs at a

greater rate than white voters. Accordingly, it follows African American voters will

also then have to rely on the reasonable-impediment provision more frequently than

white voters. Although the reasonable-impediment provision casts a wide net in

defining the types of reasonable impediments that qualify under the law, which

Defendants contend will result in almost every reason for lacking an acceptable ID to

constitute a reasonable impediment, a voter using this provision must still undertake

the additional task of filling out the reasonable-impediment form and submitting an

affidavit verifying its veracity to cast a *provisional* ballot, which is subject to rejection

if the county board believes the voter's affidavit and reasonable impediment are false. *See id.* Although Defendants assert these additional steps to vote are not overly burdensome, the use of the reasonable-impediment provision is still one more obstacle to voting, which Plaintiffs have shown will be an obstacle that African Americans will have to overcome at a rate higher than white voters, given their disproportionately lower rates of possessing qualifying IDs. Accordingly, even though at this stage the evidence shows it is "not [an] overwhelming impact," the reasonable-impediment provision nevertheless suffices as a "[s]howing [of] disproportionate impact," establishing another circumstance evidencing discriminatory intent. *McCrory*, 831 F.3d at 231 (footnote omitted).

Defendants also cite to several federal court decisions upholding similar voter-ID laws, some of which contain comparable reasonable-impediment provisions. *See, e.g.*, *Lee v. Virginia State Bd. of Elections*, 843 F.3d 592, 594 (4th Cir. 2016) (upholding Virginia's voter-ID law against both discriminatory-results and discriminatory-intent challenges); *South Carolina v. U.S.*, 898 F. Supp. 2d 30 (D.D.C. 2012) (preclearing South Carolina's updated voter-ID law, which contained a similar reasonable-impediment provision, concluding there was no discriminatory retrogressive effect or discriminatory purpose). However, these decisions are distinguishable from the present case and in many ways inapplicable given the different claims brought by Plaintiffs in this case.

For instance, the fact that a three-judge panel precleared South Carolina's voter-ID law is inapplicable to Plaintiffs' claim here because the standard for obtaining preclearance under Section Five of the VRA requires the state to prove the proposed changes neither have the purpose nor effect of denying or abridging the right to vote on account of race. *See South Carolina*, 898 F. Supp. 2d at 33 (citation omitted). In this regard, the analysis under the effects test of Section Five is similar to a discriminatory-results analysis under Section Two of the VRA, which requires a greater showing of disproportionate impact than a discriminatory-intent claim. *See McCrory*, 831 F.3d at 231 n.8.[10] Accordingly, *South Carolina*'s analysis is inapplicable to our discriminatory-intent analysis of S.B. 824.

In addition, the facts of *Lee* are markedly different than the present. When analyzing the plaintiffs' discriminatory-intent claim against Virginia's voter-ID law, the Fourth Circuit contrasted the passage of Virginia's law against the facts in *McCrory* and observed "the legislative process contained no events that would 'spark suspicion[,]'" the Virginia legislature did not depart from the normal legislative process and allowed "full and open debate[,]" the legislature did not use racial data

---

[10] Under the legislative-purpose prong of Section Five, the *South Carolina* Court utilized a limited *Arlington Heights* analysis and determined South Carolina's voter-ID law was not enacted with a discriminatory purpose. 898 F. Supp. 2d at 46. When drafting and enacting this law, the South Carolina legislature "no doubt knew . . . that photo ID possession rates varied by race in South Carolina." *Id.* at 44. Importantly, and what distinguishes *South Carolina* from the present case, the *South Carolina* Court noted, "critically, South Carolina legislators did not just plow ahead in the face of the data showing a racial gap." *Id.* Instead, the South Carolina legislature slowed down the process and sought out input from both political parties to alleviate any potential discriminatory impact the new law might create. *Id.* at 44-46.

in crafting its legislation, and the provisions of its voter-ID law did not target any group of voters. 843 F.3d at 604 (citations omitted). Accordingly, the *Lee* Court held the plaintiffs had not shown any discriminatory intent under *Arlington Heights*. *Id.* As previously discussed, however, an analysis of S.B. 824 utilizing the *Arlington Heights* factors and in light of *McCrory* suggests there is evidence here that discriminatory intent was a motivating factor behind the passage of this act.

After analyzing S.B. 824 under the *Arlington Heights* factors and the Record before us, we conclude, based on the totality of the circumstances, Plaintiffs have shown a likelihood of success on the merits in demonstrating that discriminatory intent was a motivating factor behind enacting S.B. 824. Plaintiffs' evidence at this point supports this conclusion. For instance, Plaintiffs have sufficiently shown the historical background of S.B. 824, the unusual sequence of events leading up to the passage of S.B. 824, the legislative history of this act, and some evidence of disproportionate impact of S.B. 824 all suggest an underlying motive of discriminatory intent in the passage of S.B. 824. *See Arlington Heights*, 429 U.S. at 265-68, 50 L. Ed. 2d at 464-66.

*E. Defendants' Proffered Nonracial Motivations*

Because Plaintiffs have adequately met their initial burden of showing S.B. 824 was likely motivated by discriminatory intent, the burden shifts to Defendants "to demonstrate that the law would have been enacted without this factor." *McCrory*,

831 F.3d at 221 (citation and quotation marks omitted). Because "racial discrimination is not just another competing consideration[,]" judicial deference is "no longer justified." *Id.* (citations and quotation marks omitted). We must instead "scrutinize the legislature's *actual* non-racial motivations to determine whether they *alone* can justify the legislature's choices." *Id.* (citations omitted). Defendants' only proffered justification for S.B. 824 is that this act was crafted and enacted to fulfill our Constitution's newly added mandate that North Carolinians must present ID before voting.[11] *See* N.C. Const. art. VI, §§ 2(4), 3(2).

We recognize that in 2018 a majority of North Carolina voters voted in favor of amending Article VI of the North Carolina Constitution, requiring voters in North Carolina to present ID before voting. Indeed, this Amendment dictates the "General Assembly shall enact general laws governing the requirements of such photographic identification[.]" *Id.* Importantly, however, this same Amendment grants the General Assembly the authority to "include exceptions" when enacting a voter-ID law. *Id.*

Although the General Assembly certainly had a duty, and thus a proper justification, to enact some form of a voter-ID law, we do not believe this mandate

---

[11] We are cognizant of the fact neither party briefed this issue extensively and that additional justifications for S.B. 824, such as prevention of voter fraud and inspiring confidence in elections, were presented by the defendants in the federal district court case. *See Cooper*, ___ F. Supp. 3d at ___. However, because these justifications have not been raised on appeal, we decline to consider them in our analysis on this point. *See* N.C.R. App. P. 28(b)(6). We also acknowledge additional justifications may be brought out in a subsequent trial on the merits in this case.

"*alone* can justify the legislature's choices" when it drafted and enacted S.B. 824 specifically. *McCrory*, 831 F.3d at 221 (citations omitted). As detailed above, the General Assembly's history with voter-ID laws, the legislative history of the act, the unusual sequence of events leading to its passage, and the disproportional impact on African American voters likely created by S.B. 824 all point to the conclusion that discriminatory intent remained a primary motivating factor behind S.B. 824, not the Amendment's directive to create a voter-ID law. This is especially true where the Amendment itself allows for exceptions to any voter-ID law, yet the evidence shows the General Assembly specifically included types of IDs that African Americans disproportionately lack. Such a choice speaks more of an intention to target African American voters rather than a desire to comply with the newly created Amendment in a fair and balanced manner. Accordingly, we conclude, on this Record, Defendants have yet to show S.B. 824 would have been enacted in its current form irrespective of any alleged underlying discriminatory intent. *See id.* (citation omitted). At this stage of the proceedings, Plaintiffs have thus shown a clear likelihood of success on the merits of their Discriminatory-Intent Claim for the voter-ID provisions of S.B. 824. Therefore, the majority of the three-judge panel below erred by finding Plaintiffs failed to prove a likelihood of success on the merits.

<h3 align="center">III. Preliminary Injunction</h3>

Having concluded Plaintiffs have shown a likelihood of success on the merits of their Discriminatory-Intent Claim, we now turn to the question of whether Plaintiffs are "likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of [Plaintiffs'] rights during the course of litigation." *Kennedy*, 160 N.C. App. at 8, 584 S.E.2d at 333 (citation and quotation marks omitted). In undertaking this analysis, we "weigh the equities" for and against a preliminary injunction. *Redlee/SCS, Inc. v. Pieper*, 153 N.C. App. 421, 427, 571 S.E.2d 8, 13 (2002).

Plaintiffs contend they are likely to sustain irreparable harm because, *inter alia*, S.B. 824 violates Plaintiffs' constitutional right to vote on equal terms. As discussed previously, Plaintiffs have a fundament right to participate in elections on an equal basis. *See Blankenship*, 363 N.C. at 522, 681 S.E.2d at 762 ("The right to vote is one of the most cherished rights in our system of government, enshrined in both our Federal and State Constitutions." (citations omitted)); *see also Dunn*, 405 U.S. at 336, 31 L. Ed. 2d at 280 (citations omitted). The Fourth Circuit has recognized: "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C.*, 769 F.3d at 247 (citations omitted). Further, "discriminatory voting procedures in particular are the kind of serious violation of the Constitution . . . for which courts have granted immediate relief." *Id.* (citation and quotation marks omitted). The need for immediate relief is

especially important in this context given the fact that "once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin [the] law." *Id.* (footnote omitted).

With these principles in mind, we agree with Plaintiffs that absent an injunction, Plaintiffs have shown they are likely to suffer irreparable harm. As demonstrated *supra*, S.B. 824's voter-ID requirements are likely to disproportionately impact African American voters to their detriment. Although Plaintiffs may still have their vote counted by utilizing the reasonable-impediment provision, such a fact does not automatically negate the injury Plaintiffs still will have suffered—the denial of equal treatment in voting—based on a law allegedly motivated by discriminatory intent. *See id.* (citation omitted).

In addition, enjoining the voter-ID provisions furthers "the public interest[, which] favors permitting as many qualified voters to vote as possible." *Id.* (alterations, citation, and quotation marks omitted). Furthermore, S.B. 824 has already been enjoined at least for the March primaries by the federal district court. While the future of that injunction and litigation is uncertain, enjoining the law during the litigation of this action, which the parties acknowledged would still be ongoing after these primaries, further helps prevent voter confusion leading up to the general election this fall and during the pendency of this litigation, which voter confusion has a strong potential to negatively impact voter turnout. Balancing the

equities in this case, Plaintiffs have adequately shown they are "likely to sustain irreparable loss unless the injunction is issued[.]" *Kennedy*, 160 N.C. App. at 8, 584 S.E.2d at 333 (citation and quotation marks omitted). Therefore, Plaintiffs have shown they are entitled to a preliminary injunction enjoining the voter-ID provisions of S.B. 824. *See id.* (citation omitted).

As for the scope of this injunction, Legislative Defendants assert the injunction should be limited solely to the individual Plaintiffs, and not statewide, because "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702, 61 L. Ed. 2d 176, 193 (1979). However, *Califano* also noted one of the "principles of equity jurisprudence" is that "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Id.* (citation omitted). Accordingly, *Califano* supports the proposition that injunctive relief should extend statewide because the alleged violation—the alleged facial unconstitutionality of S.B. 824—impacts the entire state of North Carolina. *See id.*; *see also Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019) (upholding a district court's grant of a statewide preliminary injunction of an Arkansas anti-loitering statute where only two individual plaintiffs brought a facial challenge to the statute under the First Amendment). Thus, Plaintiffs have shown the need for a statewide preliminary injunction barring Defendants from implementing or enforcing the voter-

ID provisions of S.B. 824 as to all North Carolina voters pending a ruling on the merits of Plaintiffs' facial challenge under the North Carolina Constitution. Consequently, we reverse the trial court's denial of Plaintiffs' Preliminary-Injunction Motion.

## **Conclusion**

Accordingly, for the foregoing reasons, we reverse the trial court's decision to deny Plaintiffs' Preliminary-Injunction Motion and remand to the trial court with instructions to grant Plaintiff's Motion and preliminarily enjoin Defendants from implementing or enforcing the voter-ID provisions of S.B. 824—including, specifically, Parts I and IV of 2018 N.C. Sess. Law 144—until this case is decided on the merits.

REVERSED AND REMANDED.

Judges ARROWOOD and COLLINS concur.